**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

KENYA SPENCER-MARTIN                                    CIVIL ACTION

VERSUS                                                             16-789-SDD-RLB

EXXON MOBIL CORPORATION

<u>RULING</u>

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendant, Exxon Mobil Corporation ("ExxonMobil"). Plaintiff, Kenya Spencer-Martin ("Plaintiff") has filed an *Opposition*[2] to this motion, to which ExxonMobil filed a *Reply*.[3] For the following reasons, the Court finds that ExxonMobil's motion should be granted.

## I. FACTUAL BACKGROUND

Plaintiff attended Southern University ("Southern") in Baton Rouge, Louisiana on a track scholarship. In 1995, while at Southern, Plaintiff suffered a left temporal brain hemorrhage and underwent brain surgery.[4] After a successful surgery, Plaintiff returned to school and continued to run track.[5] Plaintiff graduated from Southern in 2002 with a Bachelor of Science degree in math secondary education.[6]

Plaintiff was hired by ExxonMobil in 2005 as a process technician in the Halobutyl

---

[1] Rec. Doc. No. 19.
[2] Rec. Doc. No. 26.
[3] Rec. Doc. No. 31.
[4] *Id.* at 4.
[5] Rec. Doc. No. 26-1, p. 9.
[6] *Id.* at 6.
45625

finishing unit ("HFU").[7]  The HFU takes a chemical "slurry" and transforms it into rubber.[8]

In 2009, Plaintiff received a promotion to assistant operator ("AO")[9] which required her to

climb, lift, operate heavy equipment, kneel to access valves, work rotating 12-hour shifts,

train as a first responder, and remain alert at all times.[10]

During any given shift on the HFU, ExxonMobil claims that one person is operating

the control board while two AOs are present.[11]   The board operator is a supervisor,

generally either a permanent operations controller or a temporary first-line supervisor

("TFL").[12]  TFL supervisors operate the board when a permanent operations controller is

unavailable, but they are also able to operate as AOs.[13]  ExxonMobil contends the board

operator "primarily works alone, and is responsible for ensuring that operations run

smoothly and for providing directions to the [AOs]."[14]  A board operator "must be alert …

able to react quickly … able to quickly respond to all alarms and emergencies, and must

be able to conduct emergency shutdowns of the HFU;" thus, the board operator is a

"safety-sensitive position."[15]  In February 2010, Plaintiff qualified to operate the board as

a TFL but was never promoted to permanent operations controller.[16]

During her employment, ExxonMobil contends Plaintiff completed annual medical

evaluations.[20]  Although Plaintiff disclosed her previous brain surgery in 1995, ExxonMobil

---

[7] Rec. Doc. No. 19-3, pp. 9-10.
[8] *Id.* at p. 159, ¶ 6.
[9] *Id.* at 36.
[10] *Id.* at 159-160, ¶¶ 11, 12, 14, & 15.
[11] *Id.* at 160, ¶ 13.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 160, ¶ 15.
[15] *Id.*
[16] *Id.* at 56-57; 125-126.
[20] Rec. Doc. No. 19-3, p. 20.
45625

claims that Plaintiff never disclosed a history of actual seizures.[21]

Prior to her promotion to a TFL supervisor, Plaintiff underwent a medical exam at work on December 28, 2009. During this examination, ExxonMobil contends Plaintiff denied any history of seizures or epilepsy.[22] One month later, however, on January 28, 2010, Plaintiff saw her neurologist, Dr. Jon Olson ("Dr. Olson"), and reported that she had been experiencing headaches, dizziness, blurred vision, confusion, memory loss, episodic nausea, and night sweats for the past three years; notably, she reported that, in the two months prior to this visit, these symptoms increased in frequency to once or twice a week.[23] Plaintiff testified that, at this visit, Dr. Olson prescribed the anti-seizure medication Zonisamide, advised that she was experiencing epileptic discharges, and advised Plaintiff that she could not drive for six months on the new medication.[24] Plaintiff further testified that, because she believed Dr. Olson only prescribed the anti-seizure medication as a precaution, she did not disclose to ExxonMobil that she was diagnosed with epilepsy or had experienced seizures.[25]

On February 3, 2010, Plaintiff underwent a medical exam specifically for the purpose of determining her ability to serve as a safety-sensitive TFL supervisor. In this exam, Plaintiff answered "Yes" to the question asking if she had experienced "a seizure, epilepsy, or fits"[26]; however, Yolanda Hill ("Hill"), a nurse practitioner in the Medical Occupational Health ("MOH") department for ExxonMobil declared that, when she

---

[21] Rec. Doc. No. 23, pp. 1-8.
[22] *Id.* at pp. 30-36.
[23] *Id.* at pp. 37-39.
[24] Rec. Doc. No. 19-3, pp. 144-148; 153.
[25] *Id.* at pp. 150-151; 155-156.
[26] Rec. Doc. No. 23, p. 50.
45625

questioned Plaintiff regarding this answer, Plaintiff responded that she marked the box because she had been prescribed anti-seizure medication as a precaution, but she had not actually previously experienced a seizure or fit and did not disclose that she actually suffered from epilepsy.[27]  ExxonMobil points out that, during the February 3, 2010 medical exam, it is clear that Plaintiff did not share the same information given to Dr. Olson just the week before.  Plaintiff contends this is because she was not feeling those symptoms "in that moment" at the time she was "filling out" the questionnaire.[28]

Later in February 2010, soon after Plaintiff qualified to work as TFL supervisor, she experienced a seizure at home after working a long shift which resulted in Dr. Olson increasing the dosage of her medication.[29]  Plaintiff's next ExxonMobil medical exam took place on December 3, 2010, and Plaintiff denied experiencing any dizziness and again did not report the February 2010 seizure.[30]  During Plaintiff's December 1, 2011 ExxonMobil medical exam, she answered in the affirmative to having had "a seizure, epilepsy, or fits"[31] but denied having epilepsy and claimed she answered affirmatively only because she was prescribed precautionary anti-seizure medication.[32]  ExxonMobil contends this pattern repeated again at Plaintiff's medical exams in 2012 and 2013.

In December 2013, Plaintiff suffered another seizure at home which occurred without warning and while Plaintiff was on seizure medication; however, there had been a manufacturer change to Plaintiff's prescribed seizure medication.[33]  Plaintiff testified

---

[27] Rec. Doc. No. 19-3 at pp. 198 (Declaration of Yolanda Hill, ¶ 6).
[28] *Id.* at pp. 150-151.
[29] Rec. Doc. No. 23 at p. 55.
[30] *Id.* at pp. 56-58.
[31] *Id.* at pp. 59-65.
[32] Rec. Doc. No. 19-3 at 198-199 (Declaration of Yolanda Hill, ¶ 7).
[33] *Id.* at 93-94.

45625

that, during this particular seizure, she was sitting down combing her daughter's hair, and she "just fell over."[34]  Plaintiff testified that her mother, who witnessed the event, told Plaintiff that she had lost consciousness "for a second or so" although Plaintiff was "not sure of the time duration."[35]  Plaintiff contacted Dr. Olson after this seizure, he increased her medication, and he advised that she should make an appointment with him.[36]  Plaintiff admitted in her deposition that she did not inform ExxonMobil of the December 2013 seizure[37] or of the increase in her seizure prevention medication.[38]  At Plaintiff's subsequent ExxonMobil medical exam on August 19, 2014, ExxonMobil claims Plaintiff denied any history of seizures.[39]

In early 2015, Plaintiff had difficulties obtaining her preferred anti-seizure medication, and she testified that, as she came close to running out of Zonisamide, she began "stretching them out."[40]  After running out of the medication, Plaintiff suffered another seizure on March 19, 2015, during which Plaintiff hit her head and lost consciousness.[41]  Plaintiff likewise failed to report this seizure to ExxonMobil because she was on vacation.[42]

On April 18, 2015, Plaintiff suffered another seizure, this time while she was working alone as a TFL supervisor operating the HFU control board.[43]  Plaintiff testified that, during this seizure, she became nauseated, she "tipped [her] head" and "got really

---

[34] *Id.* at 90 (Spencer-Martin Deposition, p. 206, line 19).
[35] *Id.* at 90 (Spencer-Martin Deposition, p. 206, lines 22-23).
[36] *Id.* at 94 (Spencer-Martin Deposition, p. 210, lines 13-14).
[37] *Id.* at 122.
[38] *Id.* at 94.
[39] Rec. Doc. No. 23 at 77-79.
[40] Rec. Doc. No. 19-3 at 98 (Spencer-Martin Deposition, p. 218, line 25).
[41] *Id.* at 100-101.
[42] *Id.* at 121.
[43] *Id.* at 104-111.

45625

stiff."[44]  She further testified that she hit her head against a desk and reclined by the floor because she felt like she was going to fall.[45]  She also testified that it was the first time that she had experienced such severe stiffness:  "I never had the stiffness and stuff, like I got really hard and jerked.  It kind of felt like I was going to fall back extremely hard."[46]  Plaintiff admitted that this seizure occurred while she was taking the anti-seizure medication by her preferred manufacturer.[47]

After being discovered by her co-workers in the HFU control room, the medical response team attended to Plaintiff and obtained emergency medical care for her.[48]  Following this episode, Dr. Olson restricted Plaintiff from driving and operating heavy machinery for six months.[49]  Plaintiff was later also restricted from working at heights and with explosive chemicals for six months.[50]

On April 23, 2015, ExxonMobil became aware of the work restrictions imposed upon Plaintiff by Dr. Olson.[51]  Plaintiff was placed on paid leave and received short-term disability benefits.[52]  Subsequently, Dr. Burgess, Assistant Occupational Health Manager for ExxonMobil, began an individualized assessment of Plaintiff's ability to safely perform the primary functions of her job.[53]  As part of this assessment, Dr. Burgess toured the HFU[54] and interviewed Plaintiff's second-line supervisor regarding her job duties.[55]  Dr.

---

[44] *Id.* at 107 (Deposition of Plaintiff, p. 227, lines 22-23).
[45] *Id.* at 108.
[46] *Id.* at 108-109 (Deposition of Plaintiff, p. 228, lines 23-25; p. 229, line 1).
[47] *Id.* at 109.
[48] *Id.* at 147.
[49] *Id.* at 148.
[50] Rec. Doc. No. 23 at 113.
[51] *Id.* at 91-92.
[52] Rec. Doc. No. 19-3 at 131-132.
[53] *Id.* at 208; 243, ¶ 6.
[54] *Id.* at 205.
[55] *Id.* at 241-242.

45625

Burgess testified that he learned that Plaintiff was required to climb ladders, process 12 to 14 displays that were "constantly producing data for the board controller to take in and process," and "make decisions rapidly and frequently" to ensure that the process "continued without variance or untoward events."[56] Dr. Burgess also reviewed the medical records provided by Dr. Olson, consulted with Dr. Olson directly, and consulted with two other doctors employed by ExxonMobil.[57] After learning about Plaintiff's medical history, including her brain surgery and seizure history, Dr. Burgess understood Plaintiff's seizure disorder to be permanent, and he expressed "grave concern on [his] part about ever returning employee to safety-sensitive duties, work at heights or other field work alone."[58]

Nevertheless, on October 19, 2015, Dr. Olson released Plaintiff to return to work without restrictions.[59] Dr. Burgess disagreed with Dr. Olson's assessment that Plaintiff could return to work and safely perform her job duties without any restrictions.[60] In fact, Dr. Burgess declared that, in his opinion, Plaintiff returning to work without restrictions would pose a direct threat to the safety of herself and others.[61]

Based on the assessment of Dr. Burgess and the MOH Department, ExxonMobil concluded that Plaintiff could no longer safely perform the functions of her current position; thus, it claims it actively sought other available job positions that could accommodate Plaintiff's work restrictions. However, ExxonMobil's Global Human

---

[56] *Id.* at 207. (Deposition of Burgess, p. 27, lines 2-8).
[57] Rec. Doc. No. 23 at 113-115.
[58] Rec. Doc. No. 19-3 at 234 (Deposition of Burgess, p. 76, lines 7-9).
[59] Rec. Doc. No. 23 at 93.
[60] *Id.* at 119-120; Rec. Doc. No. 19-3 at 244, ¶¶ 8-9.
[61] Rec. Doc. No. 19-3 at 244, ¶ 10.
45625

Resources Manager, Heidi Holmes ("Holmes"), declared under penalty of perjury that:

> [B]oth Human Resources and her management team wanted to find Ms. Spencer-Martin another position. My department searched for alternative available positions in the Baton Rouge area that could reasonably accommodate Ms. Spencer-Martin's restrictions. We searched for and considered positions both in the HFU lab as well as positions outside of HFU and the chemical plant. However, no positions were available for which Ms. Spencer-Martin was qualified.[62]

ExxonMobil contends that, after extensive review by its Disability Review Committee, which consists of members of the medical, legal, and human resources departments, Plaintiff was approved for disability separation and deemed qualified for long-term disability benefits.[63] Thus, on November 12, 2015, Plaintiff was informed by ExxonMobil that she would be separated effective December 1, 2015, and she should apply for long-term disability benefits.[64]

Rather than pursue long-term disability benefits, Plaintiff filed this lawsuit against ExxonMobil asserting disability discrimination under the Americans with Disabilities Act ("ADA")[65] and the Louisiana Employment Discrimination Law ("LEDL").[66] ExxonMobil contends that, while Plaintiff does not deny that she worked in a safety-sensitive position, suffered a seizure at work while taking preventive medication, or suffered other "spells" or seizures outside of work on other occasions, she claims ExxonMobil should have disregarded the medical opinion of Dr. Burgess and accepted the opinion of Dr. Olson that she could return to work without restrictions. ExxonMobil moves for summary

---

[62] *Id.* at 163, ¶ 13. Holmes also declares that, attached to her Declaration are several emails sent to various departments inquiring about possible available positions for Plaintiff.
[63] *Id.* at 164, ¶¶ 16-17; 149.
[64] *Id.* at 150-158.
[65] 42 U.S.C.A. § 12101 *et seq.*
[66] La. R.S. § 23:301 *et seq.*
45625

judgment on Plaintiff's claims.

In opposition to this motion, Plaintiff contends the record reflects that she clearly disclosed her head injury and brain surgery within the first year of her employment with ExxonMobil, and Plaintiff's anti-seizure prescription medication was also disclosed and well-known to ExxonMobil at that time. Plaintiff also maintains that she did not report the early at-home "spells" to ExxonMobil as seizures because she did not understand them to be "full-blown convulsions" constituting seizures.[67] Indeed, Dr. Olson characterized these episodes as "little spells"[68] and "partial seizures."[69] Plaintiff also offers the medical examination report of August 29, 2013 wherein she disclosed a head injury, history of seizures and Zonisamide;[70] yet, she was cleared for safety-sensitive duty and "[n]o medical conditions were found which prevent[ed] capable and safe job performance."[71]

Plaintiff maintains that Dr. Burgess' medical opinion should not have been given more weight than that of Dr. Olson's for a few reasons. First, Dr. Burgess worked at ExxonMobil for less than three years and is not board certified in neurology.[72] Plaintiff also claims that Dr. Burgess did not obtain her medical records from Dr. Olson,[73] and he disregarded Dr. Olson's opinion that Plaintiff's risk of another seizure is "pretty darn low."[74] Plaintiff further contends that Dr. Burgess never consulted another neurologist before determining that she should be terminated.[75]

---

[67] Rec. Doc. No. 26 at 4.
[68] Rec.Doc. No. 26-5 at 15, line 22.
[69] *Id.* at 21, line 1.
[70] Rec. Doc. No. 26-2 at 11.
[71] *Id.* at 14.
[72] Rec. Doc. No. 26-3 at 12.
[73] *Id.* at 59.
[74] *Id.* at 43.
[75] *Id.* at 56.

45625

With respect to Dr. Burgess' conclusion that Plaintiff could not return to her position without restrictions, Plaintiff claims that Dr. Burgess lacks a detailed understanding of her job duties, the substances in the HFU, and the potential danger of a control board failure in this unit. Plaintiff cites Dr. Burgess' deposition testimony wherein he admitted that he was unaware what the acronym "HFU" stood for, what the unit did with the product, or what chemicals constituted the slurry in the HFU.[76] Further, Plaintiff contends it was Dr. Olson's "understanding" that, if Plaintiff became suddenly incapacitated, nothing would "instantly blow up."[77]

Plaintiff also takes issue with the fact that Dr. Burgess never spoke to her immediate first-line supervisor, Lewis Olson, about her ability to safely perform her job duties.[78] Lewis Olson supervised Plaintiff for over five years and opined that Plaintiff should be allowed to return to work as an AO or TFLS in the HFU, that any incapacitation from a seizure would not affect the safety of Plaintiff's co-workers, and that Plaintiff's medical condition did not pose a danger to her co-workers."[79]

Additionally, Dr. Olson released Plaintiff to work without restrictions on October 19, 2015 finding that she had been seizure-free for six months and that her seizures were well-controlled on medication.[80] Plaintiff states: "Dr. Olson's impression from his conversations with Dr. Burgess is that Dr. Burgess believes 'if you have a seizure, then

---

[76] *Id.* at 25-26.
[77] Rec. Doc. No. 26-5 at 51. The Court notes that Dr. Olson did not testify to this conclusion; rather, Dr. Olson's actual testimony was that this is Plaintiff's belief about her condition: "I had a nice long discussion with her job duties, where **she didn't feel like**, if something happened, she would release a button and something would instantly blow up." *Id.* at 51, lines 10-13.
[78] Rec. Doc. No. 26-3 at 84.
[79] Rec. Doc. No. 26-6.
[80] Plaintiff cites to Rec. Doc. No. 26-4 at 1.
45625

you shouldn't be working there.'"[81]  Dr. Olson testified that, if a seizure disqualifies an employee from working in a safety-sensitive position at ExxonMobil, then it would also disqualify an employee with a heart condition or diabetes.[82]

Accordingly, Plaintiff contends that she has offered competent summary judgment evidence demonstrating the existence of genuine fact issues regarding the alleged discriminatory motive behind her termination from ExxonMobil such that summary judgment is improper.

## II.    LAW AND ANLYSIS

### A.  Motion to Strike

Before the Court considers ExxonMobil's summary judgment motion, the Court must address ExxonMobil's *Motion to Strike Plaintiff's Summary Judgment Evidence*.[83] Plaintiff filed an *Opposition*[84] to this motion, to which ExxonMobil filed a *Reply*.[85] ExxonMobil primarily challenges two items of evidence offered by Plaintiff in opposing the summary judgment motion: (1) the Declaration of Plaintiff's former first-line supervisor Lewis Olson, and (2) testimony from Dr. John Olson, Plaintiff's treating neurologist, in which Dr. Olson speculates what Dr. Burgess believes about a zero risk policy. ExxonMobil contends the testimony of Lewis Olson is speculative, lacks foundation, is conclusory, and is predicated on facts that contradict Plaintiff's sworn testimony. ExxonMobil contends Dr. Olson's testimony about Dr. Burgess' thoughts and beliefs is also speculative and inadmissible.

---

[81] Rec. Doc. No. 26 at 10, quoting Rec. Doc. No. 26-5 at 54, lines 11-12.
[82] Rec. Doc. No. 26-5 at 54.
[83] Rec. Doc. No. 28.
[84] Rec. Doc. No. 29.
[85] Rec. Doc. No. 34.
45625

1. <u>Declaration of Lewis Olson</u>

The Court finds that portions of the Declaration of Lewis Olson are inadmissible and should be stricken. While Lewis Olson may offer an opinion based on his own perceptions, *i.e.*, the level and/or type of Plaintiff's activities and abilities that he observed while supervising Plaintiff, he "may not, however, offer opinion testimony concerning the cause or extent of Plaintiff's … medical condition or Plaintiff's ability to work, [both] of which require specialized medical knowledge within the scope of Rule 702."[86] Thus, to the extent Lewis Olson offers his opinions that Plaintiff is able to safety return to work and that a sudden seizure would not pose a danger to Plaintiff's co-workers,[87] the law is clear that he is not qualified to give such an opinion. Further, Oluwaseun Ogunjumo ("Ogunjumo"), Chemical Engineer and Section Supervisor for the HFU, declared that, as a first-line supervisor, Lewis Olson "did not have the authority to determine what medical restrictions could be reasonably accommodated on the HFU."[88]

Lewis Olson's Declaration is further problematic in that his opinion that Plaintiff's medical condition did not pose a danger to her co-workers is contradicted by Plaintiff's own sworn testimony. Plaintiff admitted that others could be in danger if she became suddenly incapacitated due to a seizure.[89] Plaintiff acknowledged that she had been trained on the dangers associated with gas emissions at the plant and agreed that, if there was a gas emission at the plant or refinery while she was incapacitated, there could be "catastrophic consequences."[90] Plaintiff also confirmed that, if an alarm goes off and a

---

[86] *Kie v. Williams*, No. 3:15-CV-02304, 2016 WL 6208692 at *1 (W.D. La. Oct. 23, 2016).
[87] Rec. Doc. No. 26-6, ¶¶ 6, 10.
[88] Rec. Doc. No. 19-3 at 161, ¶ 24.
[89] *Id.* at 75 (Plaintiff's Deposition, p. 180, lines 8-12).
[90] *Id.* at 43 (Plaintiff's Deposition, p. 141, line 19); *see also id.* at 67-68.

45625

temperature adjustment is not timely made, there are risks of danger to those in the unit.[91]

Based on these admissions by Plaintiff, as a matter of law, Lewis Olson's Declaration contradicting Plaintiff's sworn testimony cannot create a material issue of fact to defeat a summary judgment motion.[92] Notably, Lewis Olson did not claim that Plaintiff was not a danger to *herself* if she suffered a seizure.

### 2. Speculative Testimony of Dr. Olson

Plaintiff has offered the testimony of Dr. Olson that it was his impression that Dr. Burgess "believed" that anyone who had ever suffered a seizure would be automatically disqualified from a safety-sensitive position at ExxonMobil. The record is clear that Dr. Burgess never testified to such a statement or belief. Notably, Dr. Olson admitted in his deposition that he did not "know what was in [Dr. Burgess'] head" and was "not a mind reader;" however, he continued to give his "understanding" of Dr. Burgess' opinions.[93] The Court is unpersuaded by Plaintiff's argument that Dr. Olson's impression of Dr. Burgess' beliefs is admissible as a non-hearsay party admission under Rule 801(d)(2) of the Federal Rules of Evidence. Dr. Olson is not a party under the rule, he made the challenged statement, and he is not an employee of ExxonMobil authorized to speak on its behalf. Because this testimony by Dr. Olson is purely speculative, the Court will grant the motion to strike this portion of Dr. Olson's testimony.

Accordingly, the *Motion to Strike Plaintiff's Summary Judgment Evidence*[94] is

---

[91] *Id.* at 72-73.
[92] *See Benoit v. MedVance Inst. of Baton Rouge*, No. 3:09-0223, 2011 U.S. Dist. LEXIS 24821, at *11 (M.D. La. Mar. 9, 2011)("A party cannot use subsequent declarations to contradict their own sworn deposition testimony or to alter their own admissions for the purpose of opposing a summary judgment and establishing a factual dispute.").
[93] Rec. Doc. No. 26-5 at 54.
[94] Rec. Doc. No. 28.
45625

granted in part and denied in part as set forth above.  To the extent that any statements offered by Lewis Olson are not inadmissible on the grounds set forth above, those statements are admissible.  The Court now turns to the pending summary judgment motion and will consider only the summary judgment evidence which has not been stricken.

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[95]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[96]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[97]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[98]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[99]

---

[95] Fed. R. Civ. P. 56(a).
[96] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[97] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[98] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[99] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
45625

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[100] All reasonable factual inferences are drawn in favor of the nonmoving party.[101] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[102] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.""[103]

### 4. Disability Discrimination under the ADA and LEDL[104]

"In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, a Title VII case."[105] The analysis first requires the plaintiff to establish a *prima facie* case of discrimination.[106] To prove a *prima facie* case for a violation of the ADA, a plaintiff must show that (1) she is disabled or regarded as disabled within the meaning of the ADA, (2) she is qualified for the job position, and (3) she was

---

[100] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[101] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[102] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[103] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[104] *See Tribble v. Ouachita Par. Police Jury*, 939 F.Supp.2d 626, 629–30 (W.D. La. 2013) ("The Fifth Circuit has held that claims brought under LEDL are analyzed using the same framework and precedent as the ADA claims, leading to the same result.").
[105] *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (internal citation omitted).
[106] *Id.*
45625

subjected to an adverse employment action on account of his disability or perceived disability.[107]    Accordingly, a "defendant may satisfy its burden on summary judgment by showing that plaintiff has failed to establish a prima facie case of discrimination."[108] However, if the plaintiff is able to make a *prima facie* showing, then the burden shifts to the defendant-employer to articulate and support with record evidence, a legitimate, non-discriminatory reason for the adverse employment action.[109]    If the employer comes forward with evidence of a non-discriminatory reason for the employment action, then the burden shifts to the plaintiff to produce record evidence from which a reasonable jury could find that the articulated reason was merely pretext for the unlawful discrimination.[110]

The Parties do not dispute that Plaintiff is disabled within the meaning of the ADA or that she suffered an adverse employment action.  ExxonMobil contends Plaintiff cannot establish the second prong of her *prima facie* case because she cannot demonstrate that she was qualified for her position.

### a.  Qualified for the Position

"The ADA protects qualified individuals with disabilities from discrimination."[111] The Act defines a "Qualified Individual" as:

> an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or

---

[107] *Id.* at 697.  *See also*, *Suggs v. Central Oil of Baton Rouge, LLC*, 2014 WL 3037213, at *5 (M.D.La. July 3, 2014).

[108] *Butler v. State, Louisiana Dept. of Public Safety and Corrections*, 2014 WL 6959940, at *8 (M.D.La. Dec. 4, 2014).

[109] *Bell v. Lane*, 2014 WL 4925682, at *6 (M.D.La. Sept. 30, 2014)(citing *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000)(citing *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[110] *Id.*

[111] *Picard v. St Tammany Parish Hospital*, 423 Fed. Appx. 467, 469 (5th Cir. 2011).

45625

interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.[112]

"The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position the individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of the position."[113]

ExxonMobil contends Plaintiff cannot prove that she was qualified for her position because she cannot establish that she could perform her job duties despite her disability. ExxonMobil claims Plaintiff has admitted that she could not perform the AO duties with the imposed restrictions.[114] Although Plaintiff maintains that she can perform the TFL supervisor duties despite her disability, ExxonMobil contends the record evidence establishes the contrary as the TLF supervisor role required Plaintiff to work alone, think and respond quickly, initiate unplanned unit shutdowns, and timely respond to emergency alarms.[115] Further, ExxonMobil contends it is undisputed that Plaintiff is incapable of performing these job duties during a seizure.

### b. Direct Threat Affirmative Defense

ExxonMobil has asserted the direct threat affirmative defense in this case. "The ADA does not protect an employee who poses a direct threat to the health and safety of

---

[112] 42 U.S.C. § 12111(8).
[113] 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *Shirley v. Precision Castparts Corp.,* 726 F.3d 675, 678 (5th Cir.2013); *Kennedy v. Parkview Baptist School Inc.,* 2014 WL 7366256 at *6 (M.D. La. Dec. 24, 2014).
[114] *See* Rec. Doc. No. 19-3 at 39.
[115] *Id.* at 59, 61, 64-67, 70, 74-76.
45625

herself or others in the workplace."[116]  A direct threat is a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."[117]  "Under the direct threat defense, an otherwise qualified employee—someone capable of performing the job's essential functions—becomes effectively unqualified by [her] inability to *safely* perform the essential functions of the job."[118]  Courts consider several factors in determining whether an employee's disability poses a direct threat, including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.[119]  An employer must make an "individualized assessment of the individual's present ability to safely perform the essential function of the job."[120]

ExxonMobil contends the summary judgment evidence presented establishes that Plaintiff is a direct threat to the safety of herself and co-workers in the AO and TFL supervisor positions, with or without reasonable accommodations.  Plaintiff argues the evidence shows that Dr. Olson released Plaintiff back to work with no restrictions after monitoring her for six months, during which time she was seizure-free.  Thus, Plaintiff contends there is a genuine issue of material fact as to whether she constitutes a "direct threat" to herself and/or her co-workers.

Very similar circumstances were addressed by the District Court for the Southern

---

[116] *EEOC v. E.I. DuPont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007)(citing *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 296 (5th Cir.1998) (per curiam)).
[117] 42 U.S.C. § 12111(3).
[118] *Butler v. Louisiana Dep't of Pub. Safety & Corr.,* 3:12-cv-420, 2013 WL 2407567 (M.D. La. May 29, 2013)(citing *Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 276, 284, 287 (1987) and *EEOC v. Exxon,* 203 F.3d 871, 874 (5th Cir. 2000)(emphasis original)).
[119] 29 C.F.R. § 1630.2(r)(1)-(r)(4).
[120] *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 2053, 153 L.Ed.2d 82 (2002) (quoting 29 C.F.R. § 1630.2(r)).
45625

District of Texas in *Hickman v. ExxonMobil*.[121]  Hickman was employed by ExxonMobil as a Process Technician ("PT") at the Baytown, Texas refinery.[122]  PTs are assigned to posts on various units of the refinery and are responsible for the safe performance of any work required to operate the processing units and related facilities.  PTs interact with high temperature and pressure liquids and gases.[123]  Hickman's job duties included:  climbing ladders; operating and rotating pumps and compressors; inspecting and monitoring equipment; and inspecting flame patterns, header pressure, and fuel gas consumption in furnaces.[124]  PTs are also expected to drive, are the first responders in emergency situations, and perform most of their duties alone.[125]  Thus, the PT position is considered safety-sensitive.[126]

In January 2009, Hickman suffered a grand mal seizure at home and was subsequently diagnosed with epilepsy and restricted from work by her doctor.[127]  Hickman received paid time off pursuant to ExxonMobil's short-term disability plan under which benefits were available through November of 2009.[128]  During her leave, Hickman's medical records and work restrictions were reviewed by ExxonMobil's MOH headed by Dr. Paul Rountree ("Dr. Rountree").

Although Hickman's seizures continued, she was released to work by her doctor in September 2009 with several restrictions which included not driving, no exposure to

---

[121] No. H-10-5175, 2012 WL 9100358 (S.D. Tex. Sept. 27, 2012).
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
45625

hazardous activity, 24-hour supervision, and keeping both feet on the floor at all times.[129]

As Hickman continued to suffer seizures, further restrictions were added as her doctor

"understood the necessity of restricting [Hickman] from safety critical positions."[130]

As Hickman's short-term disability benefits were nearly exhausted, ExxonMobil's

Human Resources Advisor ("HR") met with Hickman in late October 2009 to discuss

reasonable accommodations that would allow her to return to work, and they also

discussed the availability of long-term disability benefits should no accommodations be

possible.[131]  Hickman advised that she was training to be promoted to Console Operator

although she had not yet been trained for this position.[132]  HR investigated both positions

and found that both were safety critical.  HR also contacted other departments in efforts

to find a position that could accommodate Hickman, to no avail.[133]  Hickman was

encouraged to apply for clerical positions, but she never appeared for a scheduled test

and chose not to pursue these positions.[134]

In November 2009, Hickman's short-term disability benefits expired, and she was

permitted to take unpaid personal leave in an effort to get her seizures under control.[135]

On January 8, 2010, Hickman was recommended, and ultimately approved, for disability

separation under ExxonMobil's long-term disability plan due to her work restrictions.  This

separation was scheduled for February 1, 2010.[136]  Meanwhile, on January 25, 2010,

Hickman received a work release from a different neurologist which only restricted her

---

[129] *Id.* at *2.
[130] *Id.* (internal quotation marks omitted).
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*
45625

from driving.[137]  Confused by this work release, Dr. Rountree contacted this doctor and discussed Hickman's medical history and job duties; ultimately, Dr. Rountree disregarded this release and processed Hickman for long-term disability separation on January 31, 2010.[138]  Hickman filed suit against ExxonMobil alleging disability discrimination under the ADA, and ExxonMobil asserted the affirmative direct threat defense.[139]

Hickman argued that, because she had been released by a neurologist with only a driving restriction, there were genuine issues of material fact regarding Hickman's ability to safely perform the essential function of her job.  Applying the four factors used to determine a direct threat, the court disagreed and concluded that Hickman did constitute a direct threat as a matter of law:

> First, although Hickman had suffered from epilepsy for less than one year at the time of her separation, she continued to suffer from seizures intermittently until her separation and beyond. (Instrument No. 28–2 at 4–6, 36, 38–39, 51, 64–65).
>
> Second, the nature and severity of the potential harm should Hickman suffer from a seizure in the course of her PT duties is undeniably very high. Each of Hickman's assigned tasks presented grave risks to an employee with a seizure disorder, not to mention to other ExxonMobil employees and the public at large. As the Fifth Circuit held in *Gulf Coast Industrial Workers Union v. Exxon Co.*, 991 F.2d 244, 252 (5th Cir.1993), PT "assignments have the capacity to place thousands of people, as well as the surrounding environment, at risk." The position is therefore "rightly characterized as safety-sensitive." *Id.*
>
> Third, because Hickman's seizures remained uncontrolled at the time of her termination, the possibility that she would suffer a seizure while at work was quite high. It does not matter that Hickman, fortunately, did not suffer a seizure while working at ExxonMobil. *Atkins v. Salazar*, 677 F.3d 667, 683 (5th Cir. 2011) ("**[A]n employee with a health condition who has experienced no on-the-job**

---

[137] *Id.* at *3.
[138] *Id.*
[139] *Id. at *7.
45625

**episodes can still pose a direct threat to workplace safety**.") (quoting *Darnell*, 411 F.3d at 662).

Finally, **the imminence of the potential harm is difficult to measure given epilepsy's unpredictable** nature, especially when it is not controlled. However, given that Hickman has continued to suffer from seizures at least through the end of 2011, one of which required hospitalization, the evidence indicates that harm was imminent as of Hickman's termination. (Instrument No. 28 at 14).

Furthermore, the Fifth Circuit has noted that the above factors should not be treated as a mathematical formula. *See Atkins*, 677 F.3d at 682 (noting that although there was only a "small risk" that the plaintiff would experience hyperglycemia while carrying out his safety-sensitive law enforcement duties, the remaining factors were sufficient to grant summary judgment); *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir.2000) (discussing the business necessity defense, noting that "the court should take into account the magnitude of possible harm as well as the probability of occurrence. The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example."). **It is therefore not necessary that the risk of Hickman experiencing a seizure at work be immediately imminent. Given the safety-sensitive nature of her job, the remaining three factors firmly establish that Hickman's disability posed a direct threat to herself, her fellow employees, and the public.**[140]

---

[140] *Id.* at *7-*8 (emphasis added). The *Hickman* court also cited several other circuit affirming summary judgment in favor of defendants where record evidence demonstrated a plaintiff was a direct threat in a factory workplace: "In *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 44748 (11th Cir.1996), the Eleventh Circuit explained that an epileptic worker with a significant risk of seizures on the job who worked close to fast-moving and high-temperature machinery was a direct threat. The court rejected the worker's argument that there was no actual risk of harm as long as he followed instructions and worked 'downstream' from the equipment. *Id.* at 448. In *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 88687 (9th Cir. 2001), the plaintiff, a diabetic who had experienced hypoglycemic episodes where he could not communicate for a period of time and was sometimes lightheaded, operated the equipment that produced, stored, and transferred liquid chlorine. The court acknowledged the plaintiff's arguments that he lost consciousness only once in his lengthy tenure and that the potential for harm was small because of the safety features of the equipment he used. *Id.* at 893–94. However, the court concluded that the plaintiff nevertheless posed a significant risk under the direct-threat framework, noting the plaintiff's history and the fact that "a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Id.* at 894. Finally, in *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 661 (7th Cir. 2005), the Seventh Circuit concluded that a plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment. The court reached this conclusion despite plaintiff's arguments that the single doctor who evaluated him 45625

Plaintiff attempts to distinguish *Hickman* by stating that her seizures are "well-controlled" unlike Hickman's which continued uncontrolled beyond her separation from employment.[141] For the reasons set forth below, the Court acknowledges this distinction, but finds that *Hickman* remains instructive and applicable on several grounds.

### c. Analysis of Direct Threat Factors

<u>Duration of the Risk</u>

Applying the undisputed facts and applicable law to this case, the Court must analyze the four factors to determine whether Plaintiff meets the direct threat test. As to the duration of the risk, ExxonMobil contends the risk is lifelong as epilepsy is an incurable disease. Although Plaintiff offers Dr. Olson's testimony that her epilepsy is controlled and she is at low risk for seizures, Plaintiff offers no evidence to dispute that, as long as she suffers from epilepsy, she is at risk of seizure.

The Fifth Circuit has referred to epilepsy as a "relapsing-remitting condition."[142] The *Merriam Webster Dictionary* defines "relapse" as a recurrence of symptoms of a disease after a period of improvement, and "remitting" is defined as abating symptoms (as of a disease) for a period. In several cases, courts contrast a relapsing-remitting condition like epilepsy with "temporary, non-chronic impairments of short duration, with little or no permanent impact."[143] Accordingly, in the Fifth Circuit, courts recognize that epilepsy is a permanent or long-term impairment and a chronic condition with symptoms

---

was not thorough enough and that he had worked at the plant for ten months without incident. *Id.* at 660, 662."
[141] Rec. Doc. No. 26 at 18.
[142] *E.E.O.C. v. Chevron Phillips Chemical Co., L.P.*, 570 F.3d 606, 618 (5th Cir. 2009); *see also Jackson v. Louisiana ex rel. Dept. of Transp. and Development*, 2010 WL 324389 at *2 (E.D. La. Jan. 21, 2010).
[143] *Trevino v. United Parcel Service*, 2009 WL 3423039 at *9 (N.D. Tex. Oct. 23, 2009)(quoting *Chevron Phillips*, 570 F.3d at 619)).
45625

of indefinite duration.[144]

In response to Dr. Olson's opinion that Plaintiff was at low risk for seizures, Dr. Burgess testified as follows:

> [I]t's a concern for me for an employee, even in a, if we take the tack that, okay, we let her go to work with the seizure condition, and she's on medication, the fact that she cannot responsibly make sure that she has adequate medication of the type that she wants to basically make sure that she has medication on board to prevent seizures, that's an issue you know.[145]

> * * *

> [I]t doesn't take into account the fact that she may miss medication, she may have issues with, you know, insurance companies and their mail order pharmacy, you know, they may only want to give her generic and she doesn't like the generic. The fact that, you know, she does shift work and that, you know, it's documented that, you know, lack of sleep or interruption of a normal sleep cycle lowers the seizure threshold in patients … these are the sorts of things I was considering, you know, in saying do I feel comfortable putting this person back at work with a known seizure disorder, with the job responsibilities that she has.[146]

Dr. Olson agreed that Plaintiff's condition is permanent:

> Q:   It is my understanding Ms. Spencer-Martin has a permanent malformation of her brain; is that correct?
> A:   She has some postsurgical changes that will remain permanent.
> Q:   Okay. And – and the postsurgical changes to her brain are in an area that has a tendency to cause seizures; is that correct?
> A:   Well, if you mean the – is the temporal lobe an epileptogenic focus, then yes.
> Q:   And so the condition that she has that is causing her seizures right now is a permanent condition; is that true?
> A:   Yes. We've already, I think, pretty much established that.[147]

When asked if Plaintiff will always need medication to prevent seizures, Dr. Olson

---

[144] *Id.* (citing *Chevron Phillips*, 570 F.3d at 619).
[145] Rec. Doc. No. 19-3 at 239 (Deposition of Burgess, p. 81, lines 6-13).
[146] *Id.* at 239-240 (Deposition of Burgess, p. 81, lines 17-24; p. 82, lines 1-2).
[147] Rec. Doc. No. 26-5 at 11-12 (Deposition of Olson, p. 11, lines 17-25; p. 12, lines 1-6).
45625

responded: "At this point, that's my belief; yes."[148]  Thus, the Court finds that this factor weighs against Plaintiff as the evidence establishes that Plaintiff's six-month period of no seizures does not render her condition "cured" or unlikely to intermittently relapse.

Nature and Severity of Potential Harm

The Court must next look at the significance of the nature and severity of the potential harm.  This record is replete with evidence establishing the safety-sensitive nature of Plaintiff's job duties as both AO and TFL supervisor, and this has been discussed at length above.  In these positions, Plaintiff was often alone, would work in close proximity to heavy machinery, conveyor belts, and hot temperatures, and had to climb ladders and steps.  These positions required her to be capable of thinking and responding quickly to emergency alarms or emergency plant shutdowns, and she has admitted that any loss of consciousness could cause serious harm to herself and her co-workers.

Nevertheless, Plaintiff contends Dr. Burgess overstated the potential risk of danger and claims he is not qualified to make this determination based on his unfamiliarity with the HFU, lack of expertise in neurology, and failure to interview her first-line supervisor Lewis Olson.  The Court disagrees.  While Dr. Olson is more qualified to give a neurological medical opinion, Dr. Olson never visited the HFU to evaluate the risks in relation to Plaintiff's condition, and he never spoke to any of Plaintiff's supervisors.[149]  Indeed, Dr. Olson admitted that his only knowledge of Plaintiff's job duties was what she reported to him, and he was not aware that she had to climb ladders and work at heights

---

[148] *Id.* at 12 (Deposition of Olson, p. 12, line 14).
[149] *Id.* at 42.

45625

or that she was at times required to work alone.[150]  By contrast, Dr. Burgess visited the HFU, interviewed Plaintiff's second-line supervisor (who was in a position of higher authority than Lewis Olson), and reached a conclusion based on his expertise in occupational medicine.  Dr. Burgess testified that, after speaking to Plaintiff's second-line supervisor Ogunjumo, "it was to make sure that I got an opportunity to see her workplace and have them explain to me exactly what she did and the inherent risks in what she did."[151]  The summary judgment evidence before the Court does not support Plaintiff's claim that Dr. Burgess simply substituted his uninformed opinion for that of Dr. Olson's.

Admittedly not a neurologist, Dr. Burgess is board-certified in emergency medicine and occupational medicine.[152]  Taber's Medical Dictionary defines occupational medicine as the "branch of medicine dealing with work-related diseases, hazards, and injuries; working conditions; employee rehabilitation; and the regulations that pertain to these issues."  Thus, the Court finds based on the record evidence that Dr. Burgess is more qualified than Dr. Olson to evaluate and determine the risks of Plaintiff's job duties as they relate to Plaintiff's medical condition.

Similar to Plaintiff's argument herein that ExxonMobil discounted the medical opinion of Dr. Olson, Hickman argued that ExxonMobil had discounted the medical opinion of the doctor who released her to work.  The *Hickman* court rejected Hickman's argument, stating:  "Although Hickman claims that Dr. Slater's medical release establishes that she was able to perform her job safely, neither ExxonMobil nor this Court

---

[150] *Id.* at 43-44.
[151] Rec. Doc. No. 19-3 at 242 (Deposition of Burgess, p. 84, lines 7-11).
[152] Rec. Doc. No. 19-3 at 201-202.
45625

is required to blindly rely on a last-minute work release."[153]  The court also rejected

Hickman's argument that summary judgment was improper because Dr. Rountree

disagreed with the opinion of her third neurologist.  The court explained:

> Hickman misunderstands the standard for summary judgment where direct
> threat is involved. ExxonMobil need not show that no reasonable jury could
> find that she could safely return to work. ExxonMobil need only show that
> no reasonable jury could find ExxonMobil and Dr. Rountree acted
> unreasonably when making its individualized determination of Hickman's
> ability to safely work as a PT. *See Echazabal*, 536 U.S. at 86 (2002);
> *Wurzel*, 2012 WL 1449683, at *13. It is clear that Dr. Rountree's decision to
> continue Dr. Schwartz's restrictions after speaking to Dr. Slater in January,
> 2010, was based on objective medical evidence of Hickman's uncontrolled
> seizures, an analysis of her job duties, and an individualized inquiry that
> included concurrences from Hickman's physicians. (Instrument No. 28–5 at
> 16, 18–22, 33).

> This Court therefore concludes that, as a matter of law, ExxonMobil's
> determination that Hickman posed a direct threat was based on a
> reasonable medical judgment and best available objective evidence and
> reflected an individualized assessment of Hickman's abilities.[154]

In the present case, the Court finds that Dr. Burgess reached his conclusions about

the nature of the severity of the potential harm based on reasonable medical judgment

and the best objective evidence after a thorough individualized assessment of Plaintiff's

condition and abilities.

### Likelihood and Imminence that Potential Harm Will Occur

The fact that Plaintiff's condition is a "relapsing-remitting condition" that can occur

at any time without warning and while on medication has been established.  Indeed, the

---

[153] *Hickman*, at *9.  The *Hickman* court noted: "Similar to the Sixth Circuit's reasoning in *Wurzel*, where the
court found it reasonable for the defendant to discount two treating cardiologists' opinions in favor of its own
doctor's [sic], it was reasonable for Dr. Rountree to make rely on his own medical judgment as well as the work
restrictions put in place by two of Hickman's previous neurologists. *See Wurzel*, 2012 WL 1449683,
at *13."
[154] *Id.*
45625

record evidence demonstrates that Plaintiff suffered seizures in February 2010, December 2013, March 2015, and April 2015, three while she was on medication. While Dr. Olson testified that "she could go several years without a seizure," he could not state that Plaintiff was no longer at risk of having another seizure.[155]

In *Nall v. BNSF Railway Company*,[156] the court noted that "courts routinely uphold a defendant's direct-threat defense when a plaintiff does not pose an immediately imminent risk, but for whom even a momentary lapse in condition could have disastrous consequences." In *Moses v. American Nonwovens, Inc.*,[157] the Eleventh Circuit found that an epileptic worker with a significant risk of seizures on the job who worked close to fast-moving and high-temperature machinery was a direct threat. The court rejected the worker's argument that there was no actual risk of harm as long as he followed instructions and worked "downstream" from the equipment.[158] In *Hutton v. Elf Atochem North America, Inc.*,[159] the diabetic plaintiff who had experienced hypoglycemic episodes where he could not communicate for a period of time and was sometimes lightheaded, operated the equipment that produced, stored, and transferred liquid chlorine. The court acknowledged the plaintiff's arguments that he lost consciousness only once in his

---

[155] Rec. Doc. No. 26-5 at 48 (Deposition of Olson, p. 48, lines 6-7).
[156] 2017 WL 607126 at *20 (S.D. Tex. Feb. 14, 2017)(citing *e.g.*, *Hickman*, 2012 WL 9100358, at *8 (noting that the nature and severity of the potential harm was "very high" because thousands of people and the surrounding environment could be at risk if plaintiff suffered a seizure at work); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 88687 (9th Cir.2001) ("a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others."); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 661 (7th Cir. 2005) (plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment).
[157] 97 F.3d 446, 447–48 (11th Cir.1996), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997).
[158] *Id.* at 448.
[159] 273 F.3d 884, 886–87 (9th Cir.2001).
45625

lengthy tenure and that the potential for harm was small because of the safety features of the equipment he used.[160]  Nevertheless, the court concluded that the plaintiff posed a significant risk under the direct-threat framework, noting the plaintiff's history and the fact that "a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others."[161]  Finally, in *Darnell v. Thermafiber, Inc.*,[162] the Seventh Circuit concluded that a plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment. The court reached this conclusion despite plaintiff's arguments that the single doctor who evaluated him was not thorough enough and that he had worked at the plant for ten months without incident.[163]

ExxonMobil relies on *Coleman v. Pennsylvania State Police*,[164] a case in which a state police department terminated an employee after he developed post-traumatic epilepsy or seizure disorder.   Following a car accident, the plaintiff suffered a traumatic brain injury and multiple facial fractures which resulted in his disabling condition.[165]  The plaintiff's doctor estimated that his odds of having another seizure was one or two percent, the same odds as the average person, but did not provide any medical literature, studies, or research to support this estimation.[166]  Rather, the court accepted the employer's doctor's estimation that the plaintiff, considering his medical history and the medical

---

[160] *Id.* at 893–94.
[161] *Id.* at 894.
[162] 417 F.3d 657, 661 (7th Cir. 2005).
[163] *Id.* at 660, 662.
[164] No. 11-1457, 2013 WL 3776928 (W.D. Pa. July 17, 2013).
[165] *Id.* at *3.
[166] *Id.* at *6.
45625

research and literature on the subject, was at 75% to 90% risk of recurring seizures.[167] Thus, the *Coleman* court held that there was sufficient summary judgment evidence to support the employer's determination "that the likelihood of Plaintiff experiencing additional seizures, given his permanent brain damage and history of multiple seizures, some while on medication, was significantly higher than that of the average person at the time the termination decision was made."[168]

While not binding on the Court, the underlying facts, reasoning, and analysis of *Coleman* are applicable to the case at bar. Similarly, Dr. Olson's estimation that Plaintiff's risk of another seizure is in the single digits appears to be unsupported by any particular medical research or literature. Further, given the fact that Plaintiff suffered several "spells" or seizures over the course of a few years, some while on her preferred medication, the Court finds that the record evidence supports the conclusion of Dr. Burgess and the MOH Department that the imminence and likelihood of potential harm was too high to release Plaintiff back to her AO or TFLS positions with no restrictions.

### d. Individual Assessment

The ADA requires employers to conduct an individualized assessment of the [employee's] present ability to safely perform the essential functions of the job."[169] The employer's determination that an employee poses a significant risk to health or safety must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."[170]

---

[167] *Id.* at *18.
[168] *Id.*
[169] 29 C.F.R. § 1630.2(r).
[170] 29 C.F.R. § 1630.2(r); *Butler*, 2013 WL 2407567 at *6 (citing *Kapche*, 403 F.3d at 498 ("individualized assessment is required under the direct threat inquiry")).
45625

Plaintiff maintains that Dr. Burgess failed to perform an individual assessment of her condition as it relates to her job duties. Plaintiff claims that Dr. Burgess never obtained her medical records from Dr. Olson,[171] did not consult another neurologist before determining that Plaintiff should be terminated,[172] and applied a generalized conclusion that Plaintiff must have "zero risk" of incapacitation to work in a safety-sensitive position without individually assessing Plaintiff's condition and job duties.

For many reasons already discussed, the Court finds that the summary judgment evidence[173] demonstrates that Dr. Burgess did, in fact, along with the MOH, make an individual assessment of Plaintiff and formed a reasonable medical judgment based on current medical knowledge and the best available objective evidence. First, Plaintiff's claim that Dr. Burgess did not obtain her medical records is not an accurate statement of the facts. The record evidence demonstrates that Plaintiff executed a release to ExxonMobil for all of her medical records from Dr. Olson; however, Dr. Burgess testified that he only received a synopsis from Dr. Olson, and he reviewed everything Dr. Olson gave him.[174]

As previously discussed, the record evidence shows that Dr. Burgess toured the HFU, with particular concentration on Plaintiff's work area, observed the environment and equipment, interviewed Ogunjumo regarding Plaintiff's job duties, and asked questions about potential dangers of her sudden incapacitation.

Finally, there is no evidence that Dr. Burgess made a blanket "zero risk" policy that

---

[171] *See* Rec. Doc. No. 26-3 at 59-60.
[172] *Id.* at 56.
[173] Most of the evidence Plaintiff offered in support of this argument was stricken as inadmissible previously in this opinion.
[174] Rec. Doc. No. 26-3 at 59.

45625

applied only to Plaintiff. Rather, the record evidence demonstrates the opposite. Dr. Burgess' notes state as follows:

> I presented EE's case to US-based MOH clinicians at today's OHOT meeting. General consensus is that given the safety-sensitive nature of EE's prior job duties, and given that she had a seizure for the first time while at work; the risk going forward of another event of sudden incapacitation (no matter how small) is unacceptable given the potential adverse consequences. I let the group know I was working to acquire more information from the treating neurologist in order to do the fullest assessment of EE's fitness to return to work, and that I had been in contact with HR (Belinda Feng) and Legal (Daniel Carr) to bring this case to their attention.[175]

The record also clearly demonstrates evidence of Dr. Burgess' consultations with Dr. Olson and other doctors in the MOH Department in efforts to individually assess the Plaintiff.[176]

Plaintiff's "zero risk" argument is also belied by Dr. Burgess' testimony. Dr. Burgess testified that:

> This was an individual case with individual facts presented, or data points presented to me. Based on my investigation, you know, and my expertise as an occupational medical specialist, I deemed that the risk was, the risk was such that Kenya going back into a safety-sensitive position was not in the best interest of her health and safety or the health and safety of employees around her.[177]

As to Plaintiff's complaint that ExxonMobil improperly gave more weight to Dr. Burgess' opinion than Dr. Olson's, the law is clear that, "in making a 'reasonable medical judgment,' there is no requirement that an employer disregard its own doctors' conclusions or give greater weight to the plaintiff's treating physician.[178] Indeed, the

---

[175] Rec. Doc. No. 26-3 at 123.
[176] *Id.* at 121-122.
[177] *Id.* at 47-48 (Deposition of Dr. Burgess, p. 47, lines 16-24; p. 48, line 1).
[178] *Nall*, 2017 WL 607126 at *21 (quoting *Hickman* at *9; *Wurzel v. Whirlpool Corp.*, No. 10–3629, 2012 WL 1449683, at *16 (6th Cir. April 27, 2012)).
45625

employer's doctors may very well be justified in discounting the conclusions of other treating physicians based on their review of the employee's medical record as a whole."[179] Thus, an employer need not show that no reasonable jury could find that the employee could safely return to work—only that "no reasonable jury could find [the company and its doctors] acted unreasonably when making its individualized determination of a [plaintiff's] ability to safely work."[180]

This disagreement between Dr. Olson and Dr. Burgess and the MOH doctors also fails to create a genuine issue of fact. "Even in cases where medical experts disagree in their assessment of the extent of a real risk of serious harm or death, Congress did not intend that the courts should make the final medical decision."[181] "Instead, in the midst of conflicting expert testimony regarding the degree of serious risk of harm or death, the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence."[182]

Accordingly, the Court finds that ExxonMobil has demonstrated through its own individualized assessment, and based on the available objective evidence before it, that Plaintiff was a direct threat to herself and her co-workers. Thus, Plaintiff has failed to establish a *prima facie* case under the ADA because she has not shown that she was qualified for the position.

---

[179] *Id.* (citing *Hickman* at *9 (finding that it was reasonable for the employer to discount the plaintiff's physician's release based on the record as a whole); *Wurzel* at *16 (finding that employer was entitled to favor its physician's recommendation over the plaintiff's cardiologists because they did not have current and complete information when making their recommendations).

[180] *Hickman* at *9 (citing *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *Wurzel*, 2012 WL 1449683, at *13).

[181] *Nall* at *21 (citing *Knapp v. Nw. Univ.*, 101 F.3d 473, 485 (7th Cir. 1996)).

[182] *Id.* (quoting *Knapp*, 101 F.3d at 485)(internal quotation marks omitted).

45625

## B. Reasonable Accommodation

If an employee does pose a significant risk, to avail itself of the defense, the employer must show that the risk could not be reduced or eliminated by a reasonable accommodation.[183] "Before excluding an individual from employment as a direct threat," an employer must engage in an interactive process with the employee to determine the availability of an effective accommodation that would reduce or eliminate the treat."[184]

As the *Hickman* court stated, despite ExxonMobil's legally correct judgment that Hickman constituted a direct threat, Hickman could still present a case by pointing to probative evidence that reasonable accommodations were available.[185] The Court found that: "Because she is unable to suggest reasonable accommodations, Hickman relies on her failed assertion that she could perform all the essential elements of her job safety. This bare assertion is insufficient to defeat summary judgment."[186]

The same is true in the case before the Court. Plaintiff herein offers no summary judgment evidence to create a genuinely disputed fact issue regarding ExxonMobil's inability to remove the safety-sensitive elements of the AO and TFL supervisor positions. Like Hickman, Plaintiff maintains that she was medically released to perform the essential functions of her job without restrictions. The Court has already found that Plaintiff constituted a direct threat in the AO and TFL supervisor positions. Further, the law does not require ExxonMobil to re-write or remove job duties; neither does it require

---

[183] 29 C.F.R. § 1630.2(r).
[184] *Butler* at *6 (quoting *Echazabal v. Chevron USA*, 336 F.3d 1023, 1028 (9th Cir.2003) (citing 29 C.F.R. § 1630.9); *see also EEOC v. E.I. DuPont de Nemours & Co.*, 406 F.Supp.2d 645, 652 (E.D.La.2005), *aff'd in part, rev'd in part on other grounds*, 480 F.3d 724 (5th Cir.2007) (defendant has ultimate burden of proving direct threat, including proving that any threat could not be eliminated by reasonable accommodation)).
[185] *Hickman*, at *10.
[186] *Id.*
45625

ExxonMobil to promote Plaintiff as an accommodation.[187]

Further, Plaintiff has made no argument that ExxonMobil failed to engage in an interactive process with her to obtain reasonable accommodations for her position. Indeed, the record evidence demonstrates that ExxonMobil made substantial efforts to find an open position for Plaintiff to remain; however, no positions in Baton Rouge were available at the time.[188] Thus, the Court finds that ExxonMobil did not fail to engage in the interactive process in efforts to find reasonable accommodations for Plaintiff.

### C. Discriminatory Pretext

Even if Plaintiff had presented a *prima facie* case under the ADA, Plaintiff has presented no summary judgment evidence of pretext for ExxonMobil's legitimate, nondiscriminatory reason for her termination. It is undisputed that a plaintiff's failure to meet safety qualifications for a position is a legitimate reason for termination, and Plaintiff has not argued to the contrary.[189] Thus, the burden shifts back to the Plaintiff to show that ExxonMobil's articulated reason was pretext for intentional discrimination.

Although Plaintiff did not directly address pretext, she did present the following arguments which the Court assumes *arguendo* are offered as pretext evidence: (1) Dr. Burgess' alleged failure to perform an individual assessment of Plaintiff; and (2) Dr. Burgess' alleged "zero risk" policy applied to Plaintiff alone and not applied uniformly to other employees in safety-sensitive who suffered from other threatening disabilities like diabetes or heart disease.

The Court has adequately addressed the individual medical assessment

---

[187] *See Toronka v. Continental Airlines, Inc.*, 411 Fed. Appx. 719, 724-25 (5th Cir. 2011).
[188] Rec. Doc. No. 19-3 at 165-197.
[189] *See Hickman* at *11.
45625

performed by Dr. Burgess and the MOH Department and will not revisit this issue; thus, there is no evidence of pretext based on an alleged failure to individually assess the Plaintiff.

Plaintiff's disparate treatment argument also fails as there is no summary judgment evidence that demonstrates an alleged zero risk policy. Moreover, Plaintiff's argument is based on the business necessity defense which has not been asserted by ExxonMobil and is not the standard applicable here.

Plaintiff essentially argues that there is a material issue of fact as to whether ExxonMobil uniformly applied the direct threat qualification standard. Plaintiff cites the elements necessary to establish a business necessity defense and then claims disparate treatment because "ExxonMobil allowed individuals who pose a risk of sudden incapacitation to work in safety-sensitive areas, but ExxonMobil would not tolerate no risk that Plaintiff would suddenly be incapacitated."[190]

ExxonMobil contends Plaintiff's argument regarding a uniform qualification standard is a misunderstanding of the affirmative defense before the Court. ExxonMobil correctly argues that Plaintiff has applied the wrong standard to this inquiry. This Court has stated:

> Under the ADA, employers are permitted to raise an affirmative defense to a charge of discrimination. Specifically, an employer may impose a qualification standard that is job-related and consistent with business necessity. 42 U.S.C. § 12113(a). In addition, a qualification standard "may include a requirement that an individual shall not pose a direct threat to the health or safety of" himself or others in the workplace. *See* 42 U.S.C. § 12113(b). **While these two defenses are related, they require different types of proof.** "Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability." *E.E.O.C. v.*

---

[190] Rec. Doc. No. 26 at 15.

45625

*Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) (citing 29 C.F.R. § 1630.2(r)). "In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement." *Id.*[191]

In any event, there is no record evidence that ExxonMobil actually has or has applied any so-called "zero risk" policy to employees in safety-sensitive positions.

The Court notes the Fifth Circuit's admonition that "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."[192] Indeed, "[a]n employer can make an incorrect employment decision; if based on a good faith belief with no discriminatory influences, then the court will not try the validity of the reason."[193] There is no evidence in this case of a discriminatory motive on the part of ExxonMobil. Accordingly, the Court finds that Plaintiff has failed to come forward with countervailing evidence which demonstrates a material issue of fact from which a reasonable juror could conclude that Plaintiff's termination due to a direct threat was a mere pretext for discrimination. Thus, summary judgment in favor of ExxonMobil is GRANTED, and Plaintiff's claims shall be dismissed.

---

[191] *Butler v. State, Louisiana Dept. of Public Safety and Corrections*, No. 12-00420-BAJ-RLB, 2014 WL 6959940 at *12 (emphasis added).
[192] *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir. 1995).
[193] *Jones v. Overnite Transp. Co.*, 212 Fed.Appx. 268, 275 (5th Cir. 2006)(quoting *Mayberry*, 55 F.3d at 1091).
45625

### III.     CONCLUSION

For the reasons set forth above, ExxonMobil's *Motion for Summary Judgment*[194] is GRANTED.  Plaintiff's claims are dismissed with prejudice.

*Judgment* shall be entered accordingly.

The Final Pre-Trial Conference set for July 3, 2018 is hereby canceled.  The Jury Trial set to begin on July 16, 2018 is also canceled.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>June 15, 2018</u>.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[194] Rec. Doc. No. 19.
45625